# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF MISSISSIPPI
# NORTHERN DIVISION

DO NO HARM,

<em>Plaintiff,</em>

v.

NATIONAL ASSOCIATION
OF EMERGENCY MEDICAL
TECHNICIANS,

<em>Defendant.</em>

Case No. 3:24-cv-11-CWR-LGI

# RESPONSE IN OPPOSITION TO MOTION TO DISMISS

# TABLE OF CONTENTS

Introduction ..................................................................................................................1

Background.................................................................................................................1

   I.     NAEMT's scholarship program discriminates against white students...........2

   II.    Do No Harm sues NAEMT. ..............................................................................4

Argument ...................................................................................................................6

   I.     Do No Harm plausibly alleges Article III standing............................................6

       A.    This suit does not require Member A's individual participation. .........7

       B.    Member A would have standing to sue on her own.............................9

       C.    Article III does not prohibit associations from identifying their
            members with pseudonyms. ............................................................... 17

   II.    Do Ho Harm plausibly alleges a violation of §1981...................................... 24

       A.    Section 1981 protects everyone, not just certain races, from
            discrimination. .................................................................................. 25

       B.    NAEMT's discrimination impairs white students' right to make a
            contract because of their race............................................................. 26

       C.    Race is a but-for cause of NAEMT's discrimination. ........................ 30

Conclusion............................................................................................................... 32

Certificate of Service ............................................................................................... 32

**INTRODUCTION**

NAEMT is operating a race-based "diversity" scholarship that awards money only to "students of color." White students are excluded, or at least disadvantaged, even though NAEMT admits the program is "a contract." NAEMT is violating federal law. Racial discrimination in private contracting is unlawful under 42 U.S.C. §1981.

Unable (and unenthused) to defend this blatantly illegal discrimination, NAEMT throws out a series of threshold objections. Problem is, its arguments have long been rejected by settled precedent. NAEMT raises Article III arguments that have been squarely rejected by the Fifth Circuit. It makes irrelevant arguments about retail contracts. And it (incredibly) argues that §1981 doesn't protect white Americans against race discrimination that's supposedly benign. Justice Thurgood Marshall, writing for the Supreme Court, rejected that argument decades ago.

Because NAEMT awards its scholarships based on race, it violates §1981. And because Do No Harm alleges Article III standing and states a §1981 claim, the motion to dismiss should be denied.

**BACKGROUND**

Defendant, NAEMT, is a national association that represents emergency medical professionals. Am. Compl. (Doc. 20) ¶11. It runs a racially discriminatory scholarship. Plaintiff, Do No Harm, is a national association that represents healthcare professionals, students, patients, and policymakers. ¶8. It sued NAEMT on behalf of its members who want to apply for the scholarship but are the wrong race.

1

## I.   NAEMT's scholarship program discriminates against white students.

Since 2021, NAEMT has run a diversity scholarship program. ¶14. This program awards up to four scholarships of $1,250 that may be used for tuition, fees, and books. ¶15. When picking winners, NAEMT considers applicants' commitment to entering the EMS profession, financial need, service to their community, and ability to serve as a positive ambassador for the EMS profession. ¶17. Applicants must submit an application by the deadline and describe (within 1,000 words) why they are pursuing this scholarship, their educational and employment goals, and how this scholarship would benefit them. ¶18.

The scholarship is a contract. ¶19. NAEMT states that the scholarship recipient "must sign a contract agreeing to [the] scholarship guidelines." ¶19. In exchange for $1,250, scholarship recipients must:

- Begin the educational program in the term for which the award is granted.
- Fully complete the EMS program for which the scholarship is awarded.
- Maintain passing grades and remain in good standing throughout the course of study. (Recipients may be asked to submit grades each term prior to the next scholarship payment.)
- Seek certification by testing upon completion of their EMS educational program.
- Provide follow-up information and respond to NAEMT requests pertaining to their education and career.

¶20. A scholarship recipient further agrees, in exchange for accepting the $1,250, that she will "immediately refund scholarship funds" if she "withdraws or discontinues the educational program prior to completion for reasons within his or her control." ¶21.

2

While no refund is required if the recipients are unable to complete the program "for reasons beyond their control," they must submit "[p]roof of reasons for program termination." ¶21. NAEMT's diversity scholarship program is also a contest. ¶22. Each year, at most, only four applicants will win the scholarships based on their 1,000-word essays. ¶22. Contests are classic contracts. *See, e.g.*, *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 2023 WL 6295121, at *4-5 (N.D. Ga.), *injunction pending appeal granted,* 2023 WL 6520763, at *1 (11th Cir.); *Personavera, LLC v. Coll. of Healthcare Info. Mgmt. Execs.*, 2021 WL 1313108, at *4 (E.D. Pa. Apr. 8).

The scholarship is not equally available to students of all races. Am. Compl. ¶23. To be eligible, applicants must be a student of color. ¶24. NAEMT's criteria make it clear that "[s]cholarships will be awarded to students of color." ¶25. That requirement has been constant since NAEMT launched the diversity scholarship in 2021, and NAEMT has reiterated it every year. ¶25. White students are not "students of color." ¶26. According to NAEMT, the diversity scholarship "was established" to "support underrepresented groups in joining the EMS profession," and whites are not "underrepresented" in the EMS profession. ¶27.

Because whites are not "students of color," they are flatly excluded from NAEMT's diversity scholarship. ¶31. At a minimum, NAEMT prefers applicants who are nonwhite to applicants who are white. ¶31. In 2022—the most recent year for which NAEMT published the information—NAEMT identified the winners of its diversity scholarships. None were white. ¶32.

3

## II.   Do No Harm sues NAEMT.

Do No Harm is a membership association. ¶8. It has at least one member, Member A, who is being harmed by NAEMT's racially discriminatory scholarship. ¶35. Member A is ready and able to apply for the scholarship, once this Court orders NAEMT to stop racially discriminating. ¶47.

Member A satisfies all the nonracial criteria for NAEMT's diversity scholarship. ¶37. She is a U.S. citizen. ¶36. She does not hold an EMS certification but intends to become an EMS practitioner. ¶38. She is currently attending an EMT course at a large public university. ¶39. And she is committed to completing this certification training and becoming an EMT. ¶41.

Member A would be competitive for the scholarship, but for her race. ¶41. She has a commitment to community service and will strive to be a positive ambassador for the EMS profession. ¶41. She has worked with the YMCA for nearly a decade, from cleaning bathrooms to serving on the leadership team. ¶41. She loves working with children, helping teach and mentor students of all ages, both able-bodied and disabled. ¶41. Member A has demonstrated financial need. ¶42. Though her father had set aside money for her education, she and her father are estranged, and he will not let her access the money. ¶42. Member A must work, but what little money she makes cannot cover the cost of tuition. ¶42. Member A would use the scholarship to cover tuition. ¶43.

Yet Member A is white. ¶44. Member A is not, and does not identify as, a student of color. ¶44. NAEMT's scholarship program expressly discriminates against Mem-

ber A by excluding her from competing for $1,250 based on her race. ¶45. Member A is, at a minimum, unable to compete on a racially equal footing. ¶46.

When Do No Harm filed this case, Member A was ready and able to apply for the upcoming cycle of NAEMT's diversity scholarship, once a court ordered NAEMT to stop considering race. ¶47. That process was set to open on February 1, 2024; but once this lawsuit was filed, NAEMT declined to open the process and took down the application website. ¶¶33-34. Still today, Member A wants the scholarship, is ready and able to apply, and will do so as soon as the Court orders NAEMT to stop considering race and NAEMT reopens the process. ¶47. If the Court grants that relief, Member A would promptly assemble and submit all the requested application materials. ¶48. If she won, she would meet all requirements and expectations. ¶49.

To vindicate the rights of its members, including Member A, Do No Harm sued NAEMT in January 2024. Doc. 1. Simultaneously, Do No Harm moved for a TRO and a preliminary injunction to prevent NAEMT "from closing the application window or picking a winner." Doc. 8 at 2. This Court denied the TRO sua sponte. Doc. 12. Do No Harm later withdrew its preliminary-injunction motion, after NAEMT promised it "will not close the application window or pick winners for this year's scholarship until this Court enters final judgment." Doc. 16 at 1. NAEMT moved to dismiss the complaint, Do No Harm amended as of right, and NAEMT has now moved to dismiss the amended complaint.

## ARGUMENT

NAEMT says the amended complaint fails to allege Article III standing and fails to state a claim under §1981. Under Rule 12(b)(6), this Court must "accept all factual allegations as true" and construe the facts in favor of Do No Harm. *Hester v. Bell-Textron, Inc.*, 11 F.4th 301, 304 (5th Cir. 2021). The same is true for NAEMT's Rule 12(b)(1) challenge. NAEMT does not mount a factual attack to standing with extra-pleading evidence; it facially challenges standing based solely on Do No Harm's allegations. Courts address facial attacks by applying the liberal notice-pleading standard: confining themselves to the complaint, assuming its factual allegations are true, reading general allegations to include the necessary specifics, and construing everything in the plaintiff's favor. *See, e.g., Lee v. Verizon Comm'ns, Inc.*, 837 F.3d 523, 533 (5th Cir. 2016); *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1147-48 & n.4 (10th Cir. 2015); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The Court should deny NAEMT's motion to dismiss.

## I.   Do No Harm plausibly alleges Article III standing.

An association has standing to sue on behalf of its members if the three requirements from *Hunt* are met. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344-45 (1977). Those three requirements are as follows. One of its members would have standing to sue the defendant on their own. *SFFA v. UT Austin*, 37 F.4th 1078, 1084 (5th Cir. 2022). The association seeks to vindicate interests germane to its purpose. *Id.* And the claim and relief would not require individual members' participation. *Id.* The burden to allege standing at the pleading stage is not high. *Lujan*, 504 U.S. at 561.

Even "general factual allegations" about standing "suffice" because courts must "'presume[e] that general allegations embrace those specific facts that are necessary.'" *Id.*

NAEMT concedes the second *Hunt* factor: Do No Harm seeks to vindicate interests that are "germane to [Do No Harm's] purpose." Mot. (Doc. 23) at 7. NAEMT nonetheless raises three arguments. It says this case requires Member A's individual participation. Mot. 7-8. It says Member A would lack standing to sue on her own. Mot. 8-9. And it says Do No Harm could not identify her with a pseudonym. Mot. 6-7. None of these arguments have merit.

## A.    This suit does not require Member A's individual participation.

Do No Harm has standing because neither its claim nor its relief "requires the individual members' participation." *UT*, 37 F.4th at 1084. Do No Harm brings a facial equal-protection challenge and seeks prospective relief. *See Greater Birmingham Ministries v. Sec'y of State*, 992 F.3d 1299, 1316-17 & n.29 (11th Cir. 2021) (individual participation not required for equal-protection claim and prospective injunctive relief). The member's "'individual participation' is not normally necessary when an association seeks prospective or injunctive relief." *UFCW v. Brown Grp.*, 517 U.S. 544, 546 (1996).[1]

---

[1] Do No Harm also seeks nominal damages, but NAEMT does not argue that Do No Harm lacks associational standing to seek that relief. The argument is thus forfeited. *See Brown Grp.*, 517 U.S. at 557 (third prong of *Hunt* is not jurisdictional). The argument would also be wrong. Nominal damages require no "evidence of other damages (such as compensatory, statutory, or punitive damages)." *Uzuegbunam v. Preczewski*, 141 S.Ct. 792, 798 (2021). Associations can seek nominal damages on behalf of their members. *Fla. Paraplegic Ass'n v. Martinez*, 734 F. Supp. 997, 1001 (S.D. Fla. 1990).

NAEMT suggests that Do No Harm lacks standing because its member's injury "would turn on a factual and particularized inquiry." Mot. 7. Specifically, NAEMT says that, under §1981, Do No Harm must show that a member was "refused a contract" and that, under *Comcast*, race was the "but-for" cause. Mot. 7. (citing *Comcast Corp. v. NAAAOM*, 140 S.Ct. 1009, 1014 (2020)).

NAEMT is wrong. Contrary to NAEMT's suggestion, *Comcast* "did not consider the issue of standing at all, much less organizational standing." *Fearless*, 2023 WL 6295121, at *4. Here, Do No Harm alleges that NAEMT's scholarship is racially discriminatory either on its face or by design. *See* Am. Compl. ¶¶31, 45-46; *Comm. for Effective Cellular Rules v. FCC*, 53 F.3d 1309, 1315 (D.C. Cir. 1995) ("facial challenge" does "not require the participation of individual members"). The injury caused by this discrimination is the "'inability to compete on an equal footing for a benefit,'" not the "ultimate inability to obtain the [benefit]." *Fearless*, 2023 WL 6295121, at *4. That inability-to-compete-equally injury "would not require the participation of [an association's] individual member." *Id.* The association in *Harvard* alleged the same inability-to-compete-equally injury, and every court to examine standing in that case—from the district court to the Supreme Court—found associational standing. *See SFFA v. Harvard*, 261 F. Supp. 3d 99, 110 (D. Mass. 2017) (finding standing because "the injunctive and declaratory relief requested need not be tailored to or require any individualized proof from any particular member"), *aff'd* 980 F.3d 157 (1st Cir. 2020), *aff'd on standing*, 600 U.S. 181, 198-201. That Do No Harm challenges an individualized application process

also makes no difference; Harvard's application process was even more individualized, but that posed no problem to standing. *See id.* Again, Do No Harm does not have to prove that, absent racial discrimination, Member A would have gotten the scholarship. *See infra* I.B.

In all events, NAEMT's arguments concern standing, which is neither a "claim" nor "relief" under *Hunt*. Even if "certain individual members … may need to provide testimony and other evidence to establish" standing, "the Supreme Court has made clear that *Hunt*'s third prong is satisfied" if "the nature of the claim and of the relief sought" does not make the individual participation of "each injured party indispensable to proper resolution of the cause." *Equal Rts. Ctr. v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510, 525 (D. Md. 2010) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). Do No Harm's facial claim and prospective relief do not.

### B.    Member A would have standing to sue on her own.

Member A also would have standing to sue NAEMT on her own. To have standing, an individual must allege injury, causation, and redressability. *UT*, 37 F.4th at 1084 n.5. NAEMT doesn't challenge traceability or redressability. *See* Mot. 8-9. Nor could it. Do No Harm alleges that NAEMT's use of race discriminates against white applicants like Member A, and that discrimination will be redressed by a court order telling NAEMT to stop using race. *See Gratz v. Bollinger*, 539 U.S. 244, 276 & n.23 (2003). While NAEMT does challenge the injury-in-fact prong, Member A is injured in fact in at least two different ways.

First, Member A is injured by NAEMT's race discrimination. *See* Am. Compl. ¶¶45-46. "The badge of inequality and stigmatization conferred by racial discrimination is a cognizable harm in and of itself providing grounds for standing." *Moore v. Dep't of Agric.*, 993 F.2d 1222, 1224 (5th Cir. 1993); *see also Gresham v. Windrush Partners, Ltd.*, 730 F.2d 117, 1424 (11th Cir. 1984) ("'Victims of discrimination suffer irreparable injury, regardless of pecuniary damage.'").

Second, Member A is harmed by her inability to compete for the scholarship on an equal footing. Am. Compl. ¶¶45-46. The Supreme Court has repeatedly made it clear that "'the injury in fact' in an equal protection case … is the denial of equal treatment resulting from the imposition of the [racial] barrier, not the ultimate inability to obtain the benefit." *Gratz*, 539 U.S. at 262 (quoting *Ne. Fla. Chapter v. Jacksonville*, 508 U.S. 656, 666 (1993)); *see also Shea v. Kerry*, 796 F.3d 42, 50 (D.C. Cir. 2015) ("[T]he injury lies in the denial of an equal *opportunity* to compete, not the denial of the job itself."); *Fearless*, 2023 WL 6295121, at *4 (applying "the 'inability to compete on equal footing' reasoning from *Gratz*" to §1981 claims against private parties and finding standing). Per the Fifth Circuit, an association has standing "at this stage" if a "race-conscious policy puts its white members on unequal footing with other applicants based on race." *UT*, 37 F.4th at 1086.

Member A easily alleged that injury. NAEMT maintains a diversity scholarship program that's only open to students of color. Am. Compl. ¶¶25, 27. White students are not "students of color," and Member A is not—and does not identify as—a student

of color. ¶¶26, 44. This explicit racial "barrier" alone denies Member A the "equal treatment" and opportunity to compete for the scholarship on an equal footing. *Gratz*, 539 U.S. at 262.

The purpose and effect of the scholarship program confirms the discrimination. In 2022—the most recent year for which NAEMT published the information—none of the scholarship winners were white. ¶32. And NAEMT admits it created the diversity scholarships to further "Diversity and Inclusion" and for "underrepresented groups." ¶¶27-28. But according to NAEMT, whites are *not* underrepresented in the EMS workforce. ¶27. The word "diversity" in this context, as in many others, is "a code word for discrimination." *Price v. Valvoline, LLC*, 88 F.4th 1062, 1068 (5th Cir. 2023) (Ho, J., concurring in judgment). Applicants are considered "diverse" *because* they come from certain racial groups; and the goal is to engineer a profession where every race is "represented" in rough proportion to their percentage of the U.S. population. *See id.*; *Hamilton v. Dallas Cnty.*, 79 F.4th 494, 509 (5th Cir. 2023) (en banc) (Ho, J., concurring).

At a minimum, NAEMT prefers applicants who are nonwhite to applicants who are white, based on their race. ¶31. This preference similarly denies Member A equal treatment. "[N]o court has drawn the distinction" between an explicit racial classification (like "a racial set-aside or quota") and a race-based preference (like a so-called "'holistic race-conscious admissions plan'"). *UT*, 37 F.4th at 1086. Both discriminate. *See Gratz*, 529 U.S. at 276 & n.23.

### 1.   Even if she could have applied, Member A didn't need to apply for the scholarship to have standing.

NAEMT nevertheless suggests that Member A must first apply to the diversity scholarship to have standing. *See* Mot. 8-9. That's not the law. Applicants who have not yet applied still have standing if their application would have been futile, or if they are able and ready to apply once the process becomes racially fair. *See Carney v. Adams*, 592 U.S. 53, 65-66 (2020). Do No Harm alleges both.

As Do No Harm plausibly alleges, it would be "futile" for Member A to apply to the diversity scholarship. *Teamster v. United States*, 431 U.S. 324, 365-66 (1977). An individual does not need to "translat[e]" her "desire" for a benefit "into a formal application" where that application would be a "futile gesture" because of the discrimination. *Id.* Nor does she need to allege that she "would have obtained the benefit but for the [unlawful] barrier in order to have standing." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995). Here, NAEMT said it "will" award the scholarships to "students of color." Am. Compl. ¶25. White students are not students of color or a part of an underrepresented group that this scholarship is designed to "support." ¶¶26-27. And in 2022, none of the scholarship winners were white. ¶32. NAEMT says nothing "prevent[s]" Member A from applying to the scholarship. Mot. 9 (cleaned up). Neither would "a sign reading 'Whites Only' on the hiring-office door" literally prevent a job applicant from walking inside. *Teamster*, 431 U.S. at 365. An applicant's "unwillingness

to engage in a futile gesture" does not make her less of a "victim discrimination as he who goes through the motions of submitting the application." *Id.* at 365-66.

Independently, Do No Harm alleges that Member A is "'able and ready'" to apply but that NAEMT's use of race prevents her from doing so "'on an equal basis.'" *Gratz*, 539 U.S. at 262; *accord UT*, 37 F.4th at 1086. Member A "is still ready and able to apply, and will do so as soon as a court orders NAEMT to stop considering race and NAEMT reopens the application process." Am. Compl. ¶47. Member A's allegations are indistinguishable from the allegations that courts have found "sufficient to create standing" in similar contexts. *UT*, 37 F.4th at 1086.

Applicants do not need to actually apply in the past to be ready-and-able to apply in the future. *See, e.g.*, *Greer's Ranch Café v. Guzman*, 540 F. Supp. 3d 638, 646 (N.D. Tex. 2021) ("election not to file [a] … grant application does not foreclose … injury-in-fact" under the able-and-ready standard); *Gratz*, 539 U.S. at 261 (plaintiff had standing even though he had yet to apply to transfer); *Shea*, 7967 F.3d at 50-51 (plaintiff had standing when he "refuse[d] to apply through the race-conscious program unless and until that program's use of race-conscious preferences ceased"). That requirement would make even less sense here, where Member A has *never* been able to apply. NAEMT does not let applicants apply for the scholarship until they're about to begin an EMS course, but NAEMT had not opened—and has frozen indefinitely—the application process for the one cycle Member A can apply for. Am. Compl. ¶¶16, 34.

**2.      This case is nothing like *Carney v. Adams*.**

NAEMT also suggests that the Supreme Court's decision in *Carney* imposes a heightened standard to show ability and readiness. Mot. 8. Not so. To start, *Carney* made it clear that it was not "depart[ing] from" or "modify[ing]" existing law. 141 S. Ct. at 503. The case turned on its facts. *See id.* at 501.

NAEMT mischaracterizes *Carney* as holding that plaintiffs cannot prove ability and readiness with "words of general intent." Mot. 8. The Court said the exact opposite: "We do not decide whether a statement of intent alone under other circumstances could be enough to show standing." *Carney*, 141 S. Ct. at 502. The Court stressed that "[t]his is a highly fact-specific case," *id.* at 501. The plaintiff in *Carney* lacked a real intent to apply because it was established—at summary judgment, *after* discovery—that his readiness and ability to apply was insincere. He could have applied 14 prior times but didn't; and he admitted that, after reading a law-review article suggesting that the policy was illegal, he abruptly changed his lifelong political affiliation and sued. *See id.* at 500-01. As the Court stressed over and over, it made this finding based on the "evidence" contained in "the particular *summary judgment* record before us." *Id.* at 503 (emphasis added); *accord, e.g.*, *id.* at 499 ("the record … at summary judgment"); *id.* at 500, 501 ("the summary judgment record"); *id.* at 501 ("the record evidence"); *id.* at 502 ("this particular record"); *id.* at 503 ("the context set forth by the evidence").

*Carney* in no way suggests that Do No Harm's complaint is insufficient. Unlike *Carney*—a summary-judgment case that turned on the evidence—this case is at the

14

pleading stage and turns on the complaint. Even if statements of intent were insufficient at summary judgment, *but see id.* at 502, they are sufficient at the pleading stage, where factual allegations are accepted as true and general allegations are read to contain the necessary specifics. *Lujan*, 504 U.S. at 561; *see, e.g., Christian Lab. Ass'n v. City of Duluth*, 2021 WL 2783732, at *9 & n.12 (D. Minn.) (distinguishing *Carney* on this ground); *Crawford v. Uber Techs., Inc.*, 2021 WL 3810259, at *2-3 (N.D. Cal.) (relying on "Plaintiffs' professed intent" to find standing); *Hassan v. Iowa*, 2012 WL 12974068, at *3 (S.D. Iowa) ("general allegations as to 'readiness'" are sufficient at pleading stage); *Staco Elec. Constr. Co. v. City of Kansas City*, 2021 WL 918764, at *9 & n.9 (W.D. Mo.) (similar). NAEMT's reliance on *Carney* is thus misplaced.

Nor does Do No Harm rely on a statement of general intent anyway. It alleged not only that Member A is able and ready to apply, ¶¶47-48, but also the exact scholarship cycle she wanted to apply to, ¶47; what qualifications she would highlight in her application, ¶¶37-43; and why she wants and needs the scholarship money, ¶42. These allegations must be taken as true, and NAEMT offers nothing to question or challenge them anyway. *Speech First, Inc. v. Shrum*, 92 F.4th 947, 950 (10th Cir. 2024). It was dubious that the lawyer in *Carney* would want to come out of retirement, change his political party, and be a judge. *Carney*, 141 S. Ct. at 500. But here, what student currently enrolled in an EMS program *wouldn't* want $1250 to help her pay for it? There is no insincerity here, even if NAEMT were allowed to challenge Member A's credibility on a facial challenge to standing at the pleading stage.

### 3. *Vituity* did not reach standing and is distinguishable.

NAEMT takes Do No Harm's case against Vituity out of context. *See* Mot. 9. There, Do No Harm sued to challenge a program that gave a $100,000 signing bonus only to black physicians. *See* Order (Doc. 9) at 1, *Do No Harm v. Vituity*, No. 3:23-cv-24746 (N.D. Fla.). Do No Harm moved for a TRO, and the court observed that Do No Harm "ma[de] a compelling argument … that the program blatantly violates various federal laws." *Id.* Vituity responded that Do No Harm lacked standing because its member had not yet applied to work at Vituity, and that a doctor could not even *apply* for a signing bonus until after Vituity had agreed to hire him. *Vituity* Doc. 15 at 12-13.

Do No Harm hadn't briefed Article III standing in its TRO motion, and it didn't get to reply to Vituity's standing arguments before withdrawing its TRO motion. *See Vituity* Doc. 6. True, the district court—without the benefit of Do No Harm's reply—wanted answers to Vituity's standing arguments. But it didn't rule on standing; it expressly noted that it would "keep an open mind on the issue of standing" and asked Do No Harm to brief standing later. *Vituity* Doc 19, at 2-4. But Do No Harm never had to file that brief because Vituity capitulated. The case ended after Vituity stipulated that it would no longer require doctors to be a certain race to get bonuses. *Vituity* Doc. 23.

Even if Vituity had been right about standing, its argument does not help NAEMT. Vituity's argument turned on the fact that a doctor would become eligible to apply for the challenged incentives *only after* he got hired by Vituity. *Vituity* Doc. 15 at 12-13. Here, by contrast, Member A is *already* able to apply for NAEMT's scholarship

16

(but for her race). Member A meets all nonracial eligibility criteria and is eligible to apply now; there is no speculative, intermediate eligibility requirement that she must complete but hasn't already. Am. Compl. ¶¶37-43. *Vituity* in no way detracts from Do No Harm's arguments here.

### C. Article III does not prohibit associations from identifying their members with pseudonyms.

Do No Harm does not need to divulge its members' legal names to have standing. NAEMT quotes cases, like *Summers*, that require an association to "identify members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Those cases do not apply at the pleading stage. *See Hancock Cnty. Bd. of Sup'rs v. Ruhr*, 487 F. App'x 189, 197-99 (5th Cir. 2012). Even if they did, Do No Harm satisfied that requirement. It identified a specific member, named her ("Member A"), and explained why she currently has standing. Am. Compl. ¶¶35-49. Do No Harm's allegations easily satisfy *Summers. See Shrum*, 92 F.4th at 952. Pseudonyms are just one kind of name. *See id.* at 952.

NAEMT argues that Do No Harm must not only name and identify Member A, but also use her *real* first and last name, to have standing. Mot. 6. But real names are not required under Article III. Under "[l]ongstanding and well-established doctrine," associations can prove standing without divulging the member's real name. *Shrum*, 92 F.4th at 949. Pseudonymity has "nothing to do with the district court's jurisdiction." *B.R. v. F.C.S.B.*, 17 F.4th 485, 496 (4th Cir. 2021). The omission of someone's real name "in

no way detracts" from "the components of what constitutes an Article III case or con-

troversy"—*i.e.*, injury, causation, and redressability. *Id.* at 494. Whether a person's stand-

ing allegations are true or false turns on their truth or falsity—not on her first and last

name. *Id.* at 493-95. So "no purpose" is "served by requiring an organization to identify

by name the member or members injured." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d

1032, 1041 (9th Cir. 2015). Members' real names, in other words, "ad[d] no essential

information." *Advocs. for Highway & Auto Safety v. FMCSA*, 41 F.4th 586, 594 (D.C. Cir.

2022) (cleaned up). Per a three-judge district court (two of whom are now circuit

judges), an association's "refus[al] to disclose the names of individual members" is "not

evidence that the [association] *lacks* the alleged members—[it] merely suggest[s] the [as-

sociation] has reservations about revealing those member names." *S.C. Conf. of NAACP

v. Alexander*, 2022 WL 453533, at *3 (D.S.C.) (Heytons, Gergel, Childs, J.J.).

   Various courts—including the Fifth Circuit—have rejected the requirement pro-

posed by NAEMT. In *Ruhr*, several local branches of the NAACP filed complaints

against various Mississippi counties on behalf of their members, raising allegations of

malapportionment after the census. 487 F. App'x at 193. The defendants argued that

the NAACP chapters lacked standing because "no complaint identified, by name, any

member of the local NAACP branch who was a voter from an overpopulated, under-

represented district." *Id.* at 198. The Fifth Circuit rejected this argument, finding "no

authority for the proposition that an [association] must identify a particular [standing]

member *at the pleading stage*." *Id.* It was enough that the NAACP branches alleged that

"some members *were* suffering" harm, instead of that "some members *might* suffer" harm. *Id.*; *accord Doe v. Stincer*, 175 F.3d 879, 884 (11th Cir. 1999) ("[U]nder Article III's established doctrines of representational standing, we have never held that a party suing as a representative must specifically name the individual on whose behalf the suit is brought and we decline to create such a requirement" (citing Fifth Circuit precedent)).

The Fifth Circuit has repeatedly found standing where the associations' complaints refer to members pseudonymously,[2] and sometimes even where the association don't specify *any* member, by pseudonym or otherwise.[3] In these cases, the associations' allegations that they had members who were injured sufficed.

Other courts agree with the Fifth Circuit. The NAACP was allowed to keep its members—undocumented immigrants—"anonymous" when it challenged the repeal of DACA. *NAACP v. Trump*, 298 F. Supp. 3d 209, 225 & n.10 (D.D.C.), *aff'd*, 140 S. Ct. 1891 (2020). Both labor unions and the Chamber of Commerce could keep their members anonymous when they sued federal regulators on behalf of regulated entities. *Highway Advocs.*, 41 F.4th at 592-94; *Chamber of Com. v. CFPB*, 2023 WL 5835951, at *6 (E.D. Tex.). Associations who represent the parents of minors—whose identities *must*

---

[2] *See, e.g.*, *Speech First, Inc. v. Fenves*, 979 F.3d 319, 331-32, 338 (5th Cir. 2020) (finding standing); *Fenves* Compl. (Doc. 1) ¶¶95-118 (referring to "Student A," "Student B," and "Student C"), No. 1:18-cv-1078-LY (W.D. Tex. Dec. 13, 2018).

[3] *See, e.g.*, *Ass'n of Am. Physicians & Surgeons v. Tex. Med. Bd.*, 627 F.3d 547, 548, 552-53 (5th Cir. 2010); *AAPS* Compl. (Doc. 65-2) ¶¶28-29 (unnamed "AAPS members" harmed by TMB's alleged retaliatory actions), No. 1:08-cv-675-LY (W.D. Tex. Sept. 8, 2008).

be anonymized under the Federal Rules—also can protect their members' identities. *E.g.*, *PDE v. Olentangy*, 2023 WL 4848509, at *6 n.2 (S.D. Ohio); *see* Fed. R. Civ. P. 5.2(a)(3). As can associations who represent students, like Students for Fair Admissions. *E.g.*, *SFFA v. West Point*, 2024 WL 36026, at *8 (S.D.N.Y.); *SFFA v. Naval Acad.*, 2023 WL 8806668, at *8-9 (D. Md.). The ACLU, too, has proven associational standing "without identifying members by name." ACLU-Amicus-Br.1, No. 23-6054 (10th Cir. May 30, 2023) (citing, among other examples, *Make the Rd. N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 32-33 & n.17 (D.D.C. 2019)).[4]

The Supreme Court likewise permits associations to sue without requiring them to identify their members by their real names. "Indeed, there is longstanding Supreme Court authority supporting standing for organizations whose injured members are not named." *Shrum*, 92 F.4th at 950. The doctrine of associational standing has its "roots" in *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958), which held that members of associations have a constitutional right to privacy. *Brown Grp.*, 517 U.S. at 551. "[T]o hold that Article III requires an organization to name … its members" thus "would be

---

[4] It's unfortunate that NAEMT accuses Do No Harm of "grumblin[g]" about a "theoretical" dispute. Mot. 1. Would NAEMT say the same if the NAACP or ACLU sued to protect their members from illegal discrimination? Do No Harm doesn't lack standing just because NAEMT doesn't like its mission. Far from theoretical, Member A—who comes from a modest background and has a demonstrated financial need—sincerely wants this scholarship and thinks her skin color shouldn't be a hindrance. Am. Compl. ¶42. Do No Harm and its many members agree. "[T]he doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." *UAW v. Brock*, 477 U.S. 274, 290 (1986).

in tension with one of the fundamental purposes of the organizational standing doctrine—namely, protecting individuals who might prefer to remain anonymous." *New York v. Dep't of Com.*, 351 F. Supp. 3d 502, 606 n.48 (S.D.N.Y.), *aff'd on standing*, 139 S. Ct. 2551 (2019).

NAEMT incorrectly suggests that the Supreme Court's decisions in *Summers* and *FW/PBS* prohibit the use of pseudonyms. Mot. 6. Neither case involved an association that used pseudonyms. *FW/PBS* didn't even involve an association.

The plaintiffs in *FW/PBS* lacked standing not because they were anonymous (they weren't), but because they failed to prove that any plaintiff was covered by the law. Those businesses and individuals challenged a law that denied licenses to recent convicts. The only evidence they were covered was an affidavit saying the law had been used to revoke two licenses, but that affidavit "fail[ed] to identify" those licensees. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 235 (1990). So the Court couldn't determine whether those revocations involved "any [plaintiff] before this Court." *Id.* The Court was discussing whether any party was injured, not whether an injured party used the right name.

*Summers* is similar. The associations there lacked standing not because they referred to members with pseudonyms (they didn't), but because they couldn't identify a member who had standing. Those associations asserted that, because they had so many members, there was a "statistical probability" at least one had standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). The Court rejected this theory of "probabilistic

standing," explaining that associations must "identify" or "name" a specific member with standing. *Id.* at 498-99. *Summers* addressed whether associations must identify a "specific" member, not whether associations who identify a specific member must also give his real name. *See Shrum*, 92 F.4th at 952. But *Summers* uses the words "naming" and "name." *Summers*, 555 U.S. at 499-500. So, according to NAEMT, this means that *Summers* requires names, and they must be legal names. Mot. 6. The Supreme Court, however, has repeatedly warned courts *not* to read its opinions that way. An opinion is not "'a statute'"; courts should not latch onto "stray comments and stretch them beyond their context" to resolve points the decision "had no reason to pass on." *Brown v. Davenport*, 596 U.S. 118, 141 (2022). And *Summers* "in no way" passed on whether pseudonyms are permissible. *Shrum*, 92 F.4th at 952. Numerous courts have thus rejected NAEMT's misreading of *Summers*.[5]

The Southern District of New York's decision in *Do No Harm v. Pfizer* is not persuasive. *Cf.* Mot. 6-7; 646 F. Supp. 3d 490 (S.D.N.Y. 2022). It conflicts with all the authorities discussed already. And after that court issued its decision, district courts around the country specifically considered it; and, to Do No Harm's knowledge, all but two rejected it. One of the decisions that rejects *Pfizer* was approved by the Eleventh

---

[5] *See Naval Acad.*, 2023 WL 8806668, at *9 ("significantly overreads … *Summers*"); *West Point*, 2024 WL 36026, at *8 ("overreading"); *New York*, 351 F. Supp. 3d at 606 n.48 ("overread"); *Trump*, 298 F. Supp. 3d at 226 n.10 ("tenuous"); *Make the Rd.*, 405 F. Supp. 3d at 33 n.17 ("out of context"); *cf. Do No Harm v. Pfizer*, 2024 WL 949506, at *8 (2d Cir.) (agreeing that "*Summers* does not squarely address" pseudonymity).

Circuit with respect to standing. *Fearless*, 2023 WL 6520763, at *1. And one of the courts that agreed with *Pfizer* was unanimously reversed by the Tenth Circuit. *Shrum*, 92 F.4th at 948-49 (reversing 2023 WL 4304916, at *25). District courts around the country similarly did not buy *Pfizer*'s rejection of pseudonyms. *E.g.*, *West Point*, 2023 WL 36026, at *8 & n.7 (rejecting the defendant's reliance on *Pfizer*); *Naval Acad.*, 2023 WL 8806668, at *8-9 (same); *Chamber of Com.*, 2023 WL 5835951, at *6 (same); *PDE*, 2023 WL 4848509, at *6 & n.2 (same).

The only other court to embrace *Pfizer* was the Second Circuit in that same case. That decision is unpersuasive too. The *Pfizer* panel split 2-1 and ended in a sharp disagreement over whether pseudonyms are prohibited. *See Pfizer*, 2024 WL 949506, at *14-18 (Wesley, J., concurring in part and concurring in judgment). And Do No Harm is currently seeking rehearing and will seek, if necessary, certiorari. *See* Pet'n for Reh'g (Doc. 129), No. 23-15 (2d Cir. filed Mar. 20, 2024).

The Second Circuit's decision is also inapposite at this stage, which explains why NAEMT cites it only passingly in a footnote (at 7 n.2). The Second Circuit had already held that associations need *not* "name names" at the pleading stage. *E.g.*, *Bldg. & Constr. Trades Council v. Downtown Dev., Inc.*, 448 F.3d 138, 144-45 (2d Cir. 2006). Other circuits agree, even after *Summers*. *E.g.*, *Shrum*, 92 F.4th at 947 (Tenth Circuit); *La Raza*, 800 F.3d at 1038 (Ninth Circuit); *Am. Coll. of Emergency Physicians v. BCBS of Ga.*, 833 Fed. App'x 235 n.8 (11th Cir. 2020) (organizational plaintiffs seeking "prospective equitable relief" "'need not name names to establish standing'"). *Pfizer* did not overrule or

disagree with those decisions. It distinguished them by agreeing that the rules are more lax at the pleading stage (*Pfizer*, by contrast, was decided under the summary-judgment standard). 2024 WL 949506, at *7. So the *Pfizer* majority opinion—on its own terms—rejects NAEMT's argument here.

Finally, NAEMT's string cite of circuit cases doesn't help it. *See* Mot. 7 n.3. The Tenth Circuit already addressed all of them. "[N]one of them," it explained, "addressed whether the use of a pseudonym barred standing." *Shrum*, 92 F.4th at 951. The plaintiffs in those cases lacked standing they did not "ma[k]e the requisite showing of injury by a member, pseudonymous or not." *Id.* NAEMT is wrong to suggest that these courts were somehow all banning pseudonyms. None even involved associations who used pseudonyms. *See Shrum*, 92 F.4th at 951.

For all these reasons, this Court should hold that Do No Harm plausibly alleged Article III standing.

## II. Do Ho Harm plausibly alleges a violation of §1981.

Section 1981 guarantees "[a]ll persons … the same right … to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. §1981(a). This provision "protects the equal right of all persons … to make and enforce contracts without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006). Section 1981 "'prohibits intentional race discrimination in the making and enforcement of public and private contracts.'" *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022).

NAEMT argues that Do No Harm fails to state a §1981 claim for three discrete reasons. It argues that §1981 doesn't protect whites. It argues that a plaintiff must first apply for—and be denied—a contract. And it argues that its racial discrimination is okay because it's not based on animus. *See* Mot. 9-12. These arguments are meritless.

### A.    Section 1981 protects everyone, not just certain races, from discrimination.

NAEMT argues that because "Member A is not a member of a racial minority," she's not protected by §1981. Mot. 11. This argument is badly foreclosed. It contradicts §1981(a)'s text, which guarantees "[a]ll persons … the same right … to make and enforce contracts." *See, e.g.*, *Jam. v. Int'l Corp.*, 139 S. Ct. 759, 768 (2019). And it contradicts nearly five decades of Supreme Court precedent, starting with *McDonald v. Santa Fe Trail Transportation Co.*, where the Court settled that §1981 prohibits racial discrimination "against white persons." 427 U.S. 273, 288 (1976). Section 1981, Justice Marshall explained for the Court, "was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race." *Id.* at 295; *see also Gratz*, 539 U.S. at 275-76 & n.23 (finding a violation of §1981 where the plaintiff was white).

NAEMT cites *Arguello v. Conoco* for the proposition that a plaintiff must be "'a member of a racial minority.'" Mot. 10 (quoting 330 F.3d 355, 358 (5th Cir. 2003)). But the plaintiff in *Arguello* happened to be a racial minority; *Arguello* was stating the elements of a §1981 claim in those circumstances, not holding that whites can never sue under

§1981. *See* 330 F.3d at 356. Lower courts cannot overrule the Supreme Court's decision in *McDonald*, and whites can sue under §1981 in this circuit, like every other. *See Chaline v. KCOH, Inc.*, 693 F.2d 477, 479 n.2 (5th Cir. 1982) ("Section 1981 protects white persons from racial discrimination."); *accord Chaiffetz v. Robertson Rsch. Holding, Ltd.*, 798 F.2d 731, 735 (5th Cir. 1986); *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 890 (11th Cir. 1986) ("well settled that white persons have standing to sue under §1981").

### B. NAEMT's discrimination impairs white students' right to make a contract because of their race.

Do No Harm alleges that NAEMT refuses to "make … contracts" with white students. §1981(a); *see* Am. Compl. ¶¶19-22. Section 1981 broadly protects individuals from race discrimination in "all phases and incidents of the contractual relationship." *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 302 (1994). Specifically, §1981(a) prohibits race discrimination that impairs the right to "*make* … contracts." In other words, a contract "need not already exist" to trigger §1981. *Domino's*, 546 U.S. at 476. The statute "protects the would-be contractor along with those who have already made contracts." *Id.* It "offers relief when racial discrimination blocks the creation of a contractual relationship." *Id.*

NAEMT's race requirement blocks the creation of a contractual relationship. NAEMT's scholarship program expressly seeks to form a contractual relationship between NAEMT and scholarship recipients. Am. Compl. ¶19. In exchange for $1,250, NAEMT expressly requires recipients to "sign a contract agreeing to [the] scholarship

guidelines," which include—among others—the requirements to complete the EMS programs, maintain a certain level of grades, seek certification, and provide follow-up information to NAEMT upon request. ¶19. In return, NAEMT ensures its money is spent a certain way and increases the number of EMS professionals (from its desired racial groups). ¶¶27, 29. Scholarship recipients further agree to immediately refund the funds if they voluntarily withdraw or discontinue their program. ¶21. This manifestation of "'mutual assent'" and exchange of promises are "'the essential elements of offer, acceptance, and consideration.'" *Gulf Coast Hospice LLC v. LHC Grp., Inc.*, 273 So. 3d 721, 724 (Miss. 2019); *see also Theobald v. Nosser*, 752 So. 2d 1036, 1040 (Miss. 1999) ("'All that is needed to constitute a valid consideration to support an agreement or contract is that there be either a benefit to the promissor or a detriment to the promise.'").

In addition, the scholarship program is a contest, in which only up to four scholarship recipients compete by writing essays and completing other tasks. Am. Compl. ¶22. "A contest is a common example of a unilateral contract." *Personavera,* 2021 WL 1313108, at *4. "'[P]ayment of a prize to a winner of a contest is the discharge of a contractual obligation.'" *Glasgow v. Sherwin-Williams Co.*, 901 F. Supp. 1185, 1194 (N.D. Miss. 1995). "'The acceptance by the contestants of the offer tendered by the sponsor of the contest creates an enforceable contract.'" *Id.*; *accord United States v. Chandler*, 376 F.3d 1303, 1308-12 (11th Cir. 2004) (observing the "well-settled rule" that a contest is "an offer for a unilateral contract that can be accepted by performing all the terms and conditions").

NAEMT's motion never disputes that it has contracts with the winners of its scholarships. NAEMT instead raises two arguments about contract formation. Both miss.

First, NAEMT borrows from §1981 cases from the retail-shopping context and argues that §1981 requires that the plaintiff was "'actually prevented, and not merely deterred, from entering into a contract.'" Mot. 10. By extension, according to NAEMT, Member A should have first applied for—and been denied—a scholarship to state a claim under §1981. Mot. 11-12.

This argument is wrong. The actual-prevention requirement is limited to the "*retail* context" and isn't applicable where, as here, the formation of contract is not otherwise disputed. *Arguello*, 330 F.3d at 358. Courts have recognized the difficulty in assessing whether a mallgoer who roams through an aisle is just looking without intending to buy anything or in fact seeking to buy something and contract with the merchant. *See Morris*, 277 F.3d at 753. To make out the difference, courts sometimes require plaintiffs to allege "an actual attempt to contract that was thwarted by the merchant." *Id.* Such attempts "could give rise to a contractual duty between [the plaintiff] and the merchant." *Id.* In other words, in shopping malls or retail stores, shoppers are supposed to make actual attempts to purchase items because that's how they form a retail contract.

These rules do not apply in the nonretail context, where contracts aren't usually formed by picking up an item and seeking to purchase it. Consider employment. The Supreme Court held that "[i]f an employer should announce his policy of discrimination

by a sign reading 'Whites Only' on the hiring door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuff." *Teamsters*, 431 U.S. 431 U.S. at 365-66. Also consider grant contests. There's no question that contest-based grant programs give rise to "'a contractual regime'" without requiring plaintiffs to first apply to the programs. *Fearless*, 2023 WL 6520763, at *1.

So too here. NAEMT is not a merchant. NAEMT doesn't dispute that the scholarships form a contract—either through the exchange of mutual assent or as a contest. *See* Am. Compl. ¶¶19-22. And, as explained, Do No Harm more than adequately alleges Member A's intent to contract. NAEMT cites no authority that imports the retail-context analytical framework to the nonretail context, "where the existence or formation of a contract is not at issue." *Correll v. Amazon*, 2023 WL 6131080, at *4 (S.D. Cal.) (citing *Teamsters*, 431 U.S. 431 U.S. at 365-66, and distinguishing retail cases for that reason).

Second, though Do No Harm does not think the argument is developed enough to be preserved, it's possible NAEMT is suggesting that Member A should have applied because NAEMT doesn't actually enforce its race requirement. *See* Mot. 12 ("[T]here is no allegation that NAEMT prevented her from applying for the scholarship because of her race."). But that assertion would not excuse NAEMT for maintaining an explicit racial requirement. *See, e.g.*, *Baldwin v. Morgan*, 287 F.2d 750, 752 (5th Cir. 1961) (a railroad terminal liable for racial discrimination for maintaining segregated waiting rooms and posting signs even though it did not "coercively compe[l]" the segregated use);

*Lewis v. Greyhound Corp.*, 199 F. Supp. 210, 214 (M.D. Ala. 1961) (bus carrier liable for segregated facilities and posting signs even though the carriers were "not enforcing segregation"). At best, this is a disputed factual issue that cannot be resolved against Do No Harm on a motion to dismiss.

### C.   Race is a but-for cause of NAEMT's discrimination.

Do No Harm alleges that Member A's race is a but-for cause for her inability to apply for NAEMT's diversity scholarship on an equal footing. Section 1981 requires that everyone be given "'the same opportunity to enter into contracts'" regardless of race. *Comcast*, 140 S. Ct. at 1016. NAEMT clearly violates this command by excluding or disfavoring white students.

NAEMT does not argue that Do No Harm must allege Member A would have *gotten* the scholarship—wisely so. Mot. 10. Section 1981 requires that applicants get the "same opportunity," *Comcast*, 140 S. Ct. at 1016, including the opportunity to "make … contracts," §1981(a). "[N]o authority … suggests that the 'inability to compete on an equal footing' reasoning" from equal-protection cases like *Gratz* "should not extend to challenges … programs brought under §1981." *Fearless*, 2023 WL 6295121, at *4. NAEMT doesn't dispute that race is still a but-for cause for why white students don't get scholarships. "So long as the plaintiff's [race] was one but-for cause of that decision, that is enough." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020); *accord Newman v. Amazon.com*, 2022 WL 971297, at *7 (D.D.C.).

30

NAEMT instead suggests that but-for cause isn't enough—that the plaintiff must allege that the discrimination was motivated by "race-based animus." Mot. 11-12. Implicit in NAEMT's suggestion is the belief that there is such a thing as *benign* race discrimination. But there is no such thing. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 741-42 (2007) (plurality) (collecting cases). *Gratz* made this principle clear by holding that a race-conscious affirmative-action program "violate[d] … 42 U.S.C. §1981." 539 U.S. at 275-76. Moreover, just saying certain discrimination is benign doesn't cut it. The Supreme Court always requires racial classifications—even supposedly benign ones—to satisfy strict scrutiny: The whole point of strict scrutiny is to determine whether a racial classification is "benign" or not. *See Adarand*, 515 U.S. at 225. And NAEMT makes no argument that its use of race could survive that test.

Indeed, contrary to NAEMT's contention, §1981 doesn't turn on the presence or absence of racial animus. It simply bans intentional discrimination. That much is evident from §1981's text, which doesn't create an animus requirement. And courts have made it clear too. "[L]iability for intentional discrimination under §1981 requires only that decisions be premised on race, not that decisions be motivated by invidious hostility or animus." *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 473 (11th Cir. 1999) (citing *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 669 (1987)); *accord Juarez v. Nw. Mut. Life Ins.*, 69 F. Supp. 3d 364, 370 (S.D.N.Y. 2014) ("a plaintiff who alleges a policy that is discriminatory *on its face* is not required to make further allegations of discriminatory intent or animus"). Here, Do No Harm alleges that NAEMT's race-based exclusion of white

31

students from the diversity scholarship—as well as any preference for non-white appli-

cants—is discriminatory on its face. Am. Compl. ¶31. Nothing more is required.

## CONCLUSION

The Court should deny NAEMT's motion to dismiss.[6]

Dated: April 1, 2024                    Respectfully submitted,

/s/ Emily S. Nobile                     /s/ Cameron T. Norris
Emily S. Nobile (MS Bar No. 101475)     Thomas R. McCarthy (DC Bar 489651)*
P.O. Box 6592                           Cameron T. Norris (VA Bar 91524)*
Gulfport, MS 39506                      Frank H. Chang (DC Bar 1686578)*
(601) 493-9350                          C'Zar Bernstein (DC Bar 1736561)*
esnobile@gmail.com                      CONSOVOY MCCARTHY PLLC
                                        1600 Wilson Blvd., Ste. 700
                                        Arlington, VA 22209
                                        (703) 243-9423
                                        tom@consovoymccarthy.com
                                        cam@consovoymccarthy.com
                                        frank@consovoymccarthy.com
                                        czar@consovoymccarthy.com

                                        *pro hac vice

                                        *Attorneys for Do No Harm*

## CERTIFICATE OF SERVICE

I filed this brief on the Court's electronic filing system, which will email everyone

requiring notice.

Dated: April 1, 2024                    /s/ Cameron T. Norris

---

[6] NAEMT incorrectly contends that, if this Court were to dismiss for lack of standing, it should do so "with prejudice." Mot. 12. A dismissal for lack of standing would be without prejudice. *Denning v. Bond Pharm., Inc.*, 50 F.4th 445, 452-53 (5th Cir. 2022).