# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# NORTHERN DIVISION

**DO NO HARM**,

*Plaintiff*,

v.

**NATIONAL ASSOCIATION OF EMERGENCY MEDICAL TECHNICIANS**,

*Defendant*.

CAUSE NO. 3:24-CV-11-CWR-LGI

## ORDER

Before the Court is National Association of Emergency Medical Technicians' ("NAEMT's") motion to dismiss the amended complaint. Docket No. 23. For the reasons that follow, the motion is due to be denied.

**I.    Factual and Procedural History**

Plaintiff Do No Harm "is a nationwide membership organization consisting of healthcare professionals, students, patients, and policymakers who want to protect healthcare from radical, divisive, and discriminatory ideologies." Docket No. 20 at 2. It advocates against the "woke takeover" of healthcare and disavows *all* efforts to promote diversity, equity, and inclusion within the profession. *See The Woke Establishment Reacts to Do No Harm*, DO NO HARM (May 9, 2022), https://donoharmmedicine.org/2022/05/09/the-woke-establishment-reacts-to-do-no-harm (emphasis added).

Defendant NAEMT, meanwhile, "is a national association of emergency medical responders, such as paramedics, emergency medical technicians, and other medical

professionals who provide urgent medical care." Docket No. 20 at 3. It is open to current and former members of the profession, along with students interested in pursuing a career in emergency medical services. It has established several scholarships to help students cover the expenses associated with their respective program. *See Scholarships*, NAEMT, https://www.naemt.org/resources/scholarships (last visited Mar. 25, 2025).

At some point, NAEMT recognized what it perceived to be a gap—that the EMS profession failed to reflect the communities its professionals were called to serve. In other words, NAEMT realized that the profession was more white than America. So, it chose to use *one* of its scholarships to attempt to rectify this issue. Put into perspective, no more than four of the nearly 17,000 students expected to enroll in EMS related courses would receive this scholarship. *See* Matthew Ball et al., *Paramedic Educational Program Attrition Accounts for Significant Loss of Potential EMS Workforce,* J. AM. COLL. EMERGENCY PHYSICIANS (Apr. 6, 2023), https://www.jacepopen.com/article/S2688-1152(24)00094-8/fulltext.

Since 2021, this program has awarded up to four scholarships of $1,250 each, which recipients may use towards tuition, fees, and books. This scholarship is awarded based on a recipient's "commitment to entering the EMS profession, financial need, service to the community, and ability to serve as a positive ambassador for the EMS profession." Docket No. 20 at 3 (cleaned up). The scholarship's guidelines do not list race as a factor; however, the selection process states that NAEMT "will" award the scholarship to students of color. *See* Docket No. 1-1. Upon being awarded the scholarship, recipients must:

- Begin the educational program in the term for which the award is granted;
- Fully complete the EMS program for which the scholarship is awarded;
- Maintain passing grades and remain in good standing throughout the course of study;

- Seek certification by testing upon completion of their EMS educational program and;
- Provide follow up information and respond to NAEMT requests pertaining to their education and career.

Docket No. 20 at 4 (cleaned up). If a recipient withdraws or discontinues their program for reasons within their control, they must return any scholarship funds received.

In this case, Do No Harm challenges NAEMT's diversity scholarship. In its amended complaint, filed on March 4, 2024, it alleges that (1) NAEMT operates "a race-based 'diversity' scholarship that awards money only to 'students of color,'" (2) the scholarship program "flatly" excludes white students, and (3) the program violates 42 U.S.C. § 1981. *Id.* at 1, 6.

Do No Harm specifically seeks to vindicate the rights of a member whom it identifies as "Member A," a student it claims "is being harmed by NAEMT's racially discriminatory scholarship." *Id.* at 7. It says Member A is a white woman who satisfies the nonracial scholarship criteria and would apply for the scholarship, but for her racial background.

NAEMT has now moved to dismiss the amended complaint. The parties' respective positions are discussed below.

**II.    Legal Standard**

A defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint "must contain a short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (cleaned up). Additionally, the plaintiff's claims must be plausible on their face, which means there is "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (cleaned up). The Court must accept the plaintiff's factual allegations as

3

true and make reasonable inferences in the plaintiff's favor. *Johnson v. Harris Cnty.*, 83 F.4th 941, 945 (5th Cir. 2023) (quotation marks omitted). It need not, however, accept "threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement." *Id.*

### III. Discussion

NAEMT first contends that Do No Harm lacks standing to pursue this action. It argues that Do No Harm cannot prove an "injury in fact" without providing Member A's real name. NAEMT then argues that its diversity scholarship program—which is one of the many scholarships it offers—is lawful. Each argument is addressed below.

#### A. Standing

"Standing to sue," the Supreme Court has explained, "is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). It "ensure[s] that federal courts do not exceed their authority as it has been traditionally understood." *Id.* Furthermore, it "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.*

The "irreducible constitutional minimum" of standing requires that the plaintiff allege: (1) a direct, cognizable, injury in fact that is (2) fairly traceable to the defendant's conduct and is (3) likely to be redressed by a favorable decision from the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). An injury in fact is an "invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* (cleaned up).

An organization may have standing to litigate a case "solely as the representative of its members." *Students for Fair Admission v. President and Fellows of Harvard Coll.*, 600 U.S. 181,

4

199 (2023). An organizational plaintiff has standing when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

### 1. Injury in Fact

NAEMT argues that Do No Harm cannot pursue this case because it has not identified—by name—at least one member with standing. It relies on *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), for that proposition. Do No Harm responds that *Summers* is inapplicable at the pleading stage and, in the alternative, *Summers* does not require that a member be identified by name.

#### a. *Summers* does not require Do No Harm to name Member A.

In *Summers,* an environmental case, the organizational plaintiffs pointed to Jim Bensman as an individual member who suffered an injury in fact. *Id.* at 495. NAEMT posits that the inclusion of Mr. Bensman's name reflects the requirement that an individual's name be pleaded. Respectfully, NAEMT is mistaken.

*Summers* tells us that an organizational plaintiff must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Id.* at 498 (citing *Lujan*, 405 U.S. at 563). That showing failed because Mr. Bensman's allegations were either based on past injures or were speculation that he could be harmed by an unspecified future action. *Id.* at 495-96.

*Summers* is concerned with whether an individual member's injuries are concrete and particularized, not whether an individual member's name is pleaded or otherwise

5

discernable. *Id.* at 496. It does not definitively answer the more precise question raised today: whether an organizational plaintiff must identify its affected member *by name*.

Courts interpreting *Summers* have found that an organizational plaintiff need not identify a member by name. *E.g.*, *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 773 (11th Cir. 2024); *Do No Harm v. Pfizer, Inc.*, 126 F.4th 109 (2d Cir. 2025).

The Fifth Circuit has interpreted *Summers* even more liberally. In *National Infusion Center Association v. Becerra*, 116 F.4th 488, 497 n.5 (5th Cir. 2024), the court reasoned that an organizational plaintiff can have standing by simply alleging the member's existence; "[a]lleging that a specific member exists does not require naming that member."

Given this precedent, Do No Harm is not required to identify by name its member who has suffered the alleged harm, because its claims rest on alleged harm to a specific member. It has satisfied its burden at this stage by building its case around Member A.

### b. Do No Harm has plausibly alleged that Member A's injury is concrete and particularized.

NAEMT then argues that Member A has not shown a concrete and particularized injury. It finds Member A's argument—that she *would* compile and submit an application if it removed the racial criteria—too speculative to proceed and observes that she has not been prevented from applying to the program. NAEMT relies, in part, on *Carney v. Adams*, 592 U.S. 53 (2020), for its argument that speculative injuries cannot sustain Do No Harm's burden at the pleading stage.

Do No Harm sees it differently. In its view, NAEMT misreads *Carney.* It believes that Member A has adequately shown that her race limits her ability to apply for the scholarship.

6

It is well-established that a plaintiff's alleged injury must be "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. Future injuries can provide the basis for standing only if they are "certainly impending." *Id.* at 565 n.2.

In these situations, proposed plaintiffs may establish standing by showing they are "able and ready" to apply for the scholarship if the alleged discriminatory criterion is lifted. *Carney*, 592 U.S. at 60; *see also Gratz v. Bollinger*, 539 U.S. 244, 262 (2003). The "able and ready" requirement is concerned with whether a prospective plaintiff has "come forward with some supporting facts indicating a likelihood that she will actually take the proscribed action." *Fearless Fund*, 103 F.4th at 772.

The Supreme Court examined this requirement in *Carney*. There, the plaintiff challenged a state law that required him to declare a party affiliation before running for certain judgeships. 592 U.S. at 60. Evidence presented during the summary judgment phase revealed that the plaintiff had neither applied for any vacant position for which he was eligible, nor had he cited any vacancies he would apply for in the near future. *Id.* at 60-63. There had been at least 14 open positions that he was eligible for but had not applied for. Yet he maintained that the party affiliation requirement infringed on his ability to apply, and therefore constituted an injury in fact.

The Court held that the plaintiff failed to establish standing. Its decision relied, in part, on three essentially-factual considerations: (1) the plaintiff had not applied for any position or taken efforts to determine likely openings, (2) the context of the case showed a generalized grievance, not an actual desire to become a judge, and (3) the plaintiff had merely stated his intent to apply for a position if the allegedly unlawful requirement was lifted. *See id.* at 64.

Turning back to this case, after accepting the facts as true, as the Court must at this stage, Member A has shown that she is "able and ready" to apply for NAEMT's diversity scholarship. Unlike the plaintiff in *Carney* who could not point to a specific judgeship he sought to fill, Member A has named the specific scholarship for which she intends to apply. Crediting her assertions, she has not expressed a passing desire to apply for scholarships but remains committed to applying for NAEMT's diversity scholarship if the allegedly unlawful criterion is lifted.

This case is still in its infancy. Further proceedings may reveal that Member A's assertions are, indeed, closer to the *Carney* plaintiff's "generalized grievances." Member A states that her father has "set aside money" for her education that she simply cannot access because they are "estranged." Docket No. 8-1 at 2. But while she maintains that she has "demonstrated financial need," she has not expressed an interest in NAEMT's scholarships that do not consider race. *Id.* Those matters, though, are better left for discovery.

The standard of the day requires the Court to draw reasonable factual inferences in favor of the plaintiff. Because Do No Harm has plausibly alleged that she is able and ready to apply for the diversity scholarship, it has established standing at this stage of the case.[1]

### B.    The Merits

Section 1981 guarantees all persons within the United States "the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and

---

[1] NAEMT also argues that Do No Harm lacks standing under *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2000), which precludes organizations from litigating current or future contracts they are not parties to. Docket No. 24 at 10. This Court is unaware of other courts interpreting *Domino's* in such a way and declines to do so here. It notes only that NAEMT's reading clashes with the Supreme Court's precedent on organizational standing.

equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a).

In passing the statute, "Congress established a rule for newly freed slaves by giving them the 'same right' to make and enforce contracts and to buy and sell property 'as is enjoyed by white citizens.'" *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 208 (2019) (cleaned up). This financial protection was crucial to the resolution and yes, reconstruction of society after the Civil War, as it reflected Congress's desire to "grant the Freedmen basic economic rights—to make and enforce contacts, to sue and be sued, and to purchase and lease property." Barry Sullivan, *Historical Reconstruction, Reconstruction History, and the Proper Scope of Section 1981*, 98 YALE L.J. 541, 550 (1989). The statute's reach extends beyond government contracts; it also "forbids racial discrimination in the making and enforcement of private contracts." *Bobo v. ITT, Cont'l Banking Co.*, 662 F.2d 340, 342 (5th Cir. 1981); *see Runyon v. McCrary*, 427 U.S. 160, 168 (1976).

"To succeed on a § 1981 claim, a plaintiff must establish '(1) that she is a member of a racial minority; (2) that the defendant had intent to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute.'" *Arguello v. Conoco, Inc.*, 330 F.3d 355, 358 (5th Cir. 2003) (quoting *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 751 (5th Cir. 2001)).

NAEMT raises two grounds for dismissal on the merits. It first urges that because Member A, by her own admission, is not a member of a racial minority, she cannot sustain a § 1981 claim. Second, NAEMT regurges its position that Member A has not been prevented from applying for the diversity scholarship. It submits that its "advertising criteria" denies no one—including Member A—the ability to apply for another EMS course, financial aid and

9

other scholarships, or for student membership in NAEMT. In its view, Member A simply chose not to apply for the diversity scholarship.

NAEMT's first argument will succeed or fail depending on the lens of constitutional interpretation appellate judges will ultimately decide to apply to this case. Under "the text, history, and tradition test" that the Court has embraced rigidly in Second Amendment cases, NAEMT will likely succeed. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 79 (2022) (Kavanaugh, J., concurring).

The text, history, and tradition of § 1981 favor NAEMT. The statutory text reveals § 1981 to be a color-conscious law: it expressly says that all persons have the same rights to make contracts as "white persons." Since "only the words on the page constitute the law adopted by Congress and approved by the President," and judges cannot "add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations," then NAEMT might be onto something, as the words of § 1981 imply that white persons cannot sue under it. *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020).

Any fair reading of history confirms as much. "Our country has never been colorblind." *SFFA*, 600 U.S. at 385 (Jackson, J., dissenting). From its very founding—with that odious three-fifths clause—our Nation saw centuries of race-based laws that explicitly sanctioned violence and discrimination against racial minorities.[2] The history further shows that laws like § 1981 were not intended to provide a "preference" for racial minorities.[3] That

---

[2] *See* Sandra L. Rierson, *Tracing the Roots of the Thirteenth Amendment*, 91 UMKC L. REV. 57, 71 (2022) ("The Three-Fifths Clause is the most obvious example of the Constitution's formal recognition of the institution of slavery.").
[3] *See Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 427 (1968).

10

concept simply did not exist.[4] Instead, they were informed attempts to provide the formerly-enslaved with the same rights and opportunities as their fellow Americans.

The problem with an appeal to text, history, and tradition, though, is that in 1976, the Supreme Court effectively rewrote § 1981. It held, notwithstanding the text passed by Congress and signed into law by the President, that § 1981 protects "all persons" regardless of race. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286 (1976). In line with *McDonald's* command, the Fifth Circuit has affirmed judgment in favor of a white plaintiff who brought his case under § 1981. *See Chaline v. KCOH Inc.*, 693 F.2d 477 (5th Cir. 1982).

This Court is bound by *McDonald*. It applies it faithfully here. There is no requirement that Member A be a member of a specific race to bring her claim. NAEMT's textual argument is, however, preserved for further review.

As for NAEMT's second contention, this Court agrees with the Eleventh Circuit's analysis of a similar argument in *Fearless Fund*. *See* 103 F.4th at 777. Member A alleges that she was denied the opportunity to compete on equal footing with applicants of color because of her race. If proven to be true—and the applicable standard requires us to presume its truth today— NAEMT's diversity scholarship would pose a race-based barrier to Member A that may violate § 1981.

---

[4] *See* Nancy Leong, *Enjoyed by White Citizens*, 109 GEO L.J. 1421 (2021); see also Zamir Ben-Dan, *Deeply Rooted in American History and Tradition: The U.S. Supreme Court's Abysmal Track Record on Racial Justice and Equity*, 15 ALA. C.R. & C.L. L. REV. 45, 55 (2024).

## IV.     Conclusion

The burden at this stage requires the Court to accept Do No Harm's factual allegations as true and draw reasonable factual inferences in its favor. Applying that standard, Do No Harm has met its burden, and NAEMT's motion must be denied.

Within 10 days, the parties shall contact the chambers of the U.S. Magistrate Judge to coordinate a scheduling conference.

**SO ORDERED**, this the 31st day of March, 2025.

s/ Carlton W. Reeves<br>
UNITED STATES DISTRICT JUDGE